Morning. The text of 2b 3.1 imposes two important limitations on the scope of the physical restraint enhancement. That text is brief so I could read it if it would help us get on the same page. If any person was physically restrained to facilitate commission of the offense or to facilitate escape increase by two levels, I submit that this gives rise to two limitations that together dispose of all of the arguments that the government musters in an effort to distinguish Hickman. First, it requires that any restraint that the defendant engage in or co-defendants engage in be physical and forcible. That is, that they must be a reflection of the body's capacity for movement rather than restraint accomplished merely by threats or what is communicated to the victim. Second, it requires that the defendant's activity be intended to restrain the victim and that it not merely incidentally tend to restrain the victim. The government points to the fact that the defendants ordered a victim to the ground, touched him with a gun to keep him in place, and stood in the doorway. But all of these facts rely on threats or deterrence, what is communicated to the victim in order to establish that somebody was restrained. They do not directly and actually preclude the victim from moving if they were inclined to disregard the defendant's threats. In the district court, as I understand it, both sides objected to the enhancement? They did. Both sides did object to the enhancement. And the government's position on appeal is that it was focusing on only part of the facts in the record in order to reach its conclusion about whether the enhancement applied. And then the PSR addendum noted additional facts. But respectfully, all of the facts that are cited by the government now in support of the argument that the enhancement applies were known, were stated in the PSR to which the government advocate objected. So nothing about the record changed after the PSR addendum. And indeed, the government did not withdraw its objection at sentencing. The government went into sentencing, said nothing about the fact that it was objecting to the enhancement. And only the first time that the government has ever voiced any suggestion that the enhancement might be applicable was in the red brief. So I submit respectfully to my colleague that when people who are paid to vindicate the public's interest in crime control tell a district court that a higher guideline range is not warranted, that is a good suggestion that the defendant should prevail on the merits. Do you know if that was pursuant to some sort of plea bargain, that they would not position on that issue or anything of that type, that there was some sort of an agreement reached beforehand? There was an agreement, but I don't see any evidence in the record that it embraced that guideline objection. The agreement was a bottom-of-the-guideline sentence. And I just want to be clear, it's not simply that they didn't oppose the motion that the enhancement wasn't applicable. They joined in the objection. Isn't that right? They did more than join. They suggested it. They were the first ones out of the gate to tell the district court that they didn't believe the enhancement was applicable. And then the defendant merely joined it. So, to discuss a couple of reasons that I think that the first limitation I'm suggesting that it must be physical, actual, forcible restraint as opposed to restraint accomplished by threats, there are, I think, three reasons for this limitation in the text of the guideline. One of the reasons is that it uses the word physical to modify the word restraint. AB 1.1 uses the word forcible to modify the word restraint. That word, if we apply the canon that every word must have meaning, then to say that mere threats, restraint accomplished by mere threats, all restraint qualifies, robs the word physical and the word forcible of their meaning. Second, I think the canon of a justum generis and the examples provided in the commentary and in 1B1.1 strongly support a suggestion that any restraint must be accomplished by actual physical restriction of the body's movement rather than threats. The three examples that are listed there are tying, binding, and locking up. Now, even if we accept that those are not exhaustive, and I understand Hickman said that, they still provide a meaning full signpost to what the guideline is getting at. And the three, the common feature of those three examples is that in none of them could the victim move even if they were inclined to disregard the defendant's threats. When you are bound, tied, or locked up, it doesn't matter whether or not the defendant is bluffing. You cannot move. With regard to locked up, how do you interpret that? Is that locked in a room or actually locked in handcuffs? What does that mean? I think locked in a room is adequate. I mean, if we're saying that that is trying to give that meaning that's independent of bound and tied, then locked up could mean put in a room somewhere. And still, in that example, if it really is locked, the defendant really is contained such that they couldn't get out of the room even if they were inclined to disregard the defendant's threats. So locked up means locked up, means physically locked up somewhere, but I don't think it necessarily means contact, means physical contact. And so for that reason, that illustrates why it's not necessary to hold that physical contact is necessary in each case in order to say that restraint must be physical, because if somebody were locked up and you locked the door, then it might not have any contact with the body. The third reason that I think supports this limitation is that you are dealing with an offense that is by its nature threatening, and this is the real thrust of Hickman, is that all robberies, even the most innocuous ones where, if you could use that word, but the least aggravated robberies where somebody simply approaches the teller and says, give me the money, the teller, the victim, understands that they're not supposed to move anywhere. As the Second Circuit said, it would be a very chaotic robber that walked into a bank and said, I need all the money, but if you have an appointment, please know that I'll honor that. Does the fact that the threat or whatever you want to call it entails the use of a gun, does that make a difference? In other words, if the person walks in and doesn't show a gun and says, everybody else, everybody against the wall, but there's no gun, but if he shows up and says everybody against the wall and has a gun and points them at the individuals, does it make a difference that the person sees that there's a gun and there's a real threat, that if they don't go along with what the person says, that they could be injured? Well, it certainly makes a difference to the defendant's culpability, but it doesn't — it shouldn't make a difference to the application of physical restraint, because if you come in and demand the money, the implication is that something will be done to you, maybe a concealed gun or maybe just fisticuffs or something, but it's not robbery unless the victim believes that they're in danger of some kind of physical attack. So the same way that a victim confronted with a gun understands they're not supposed to run away, a victim just told there will be a physical attack or where a physical attack is implied, they also understand they're not supposed to run away, and so both victims, I suppose, would feel restrained, would feel physically restrained by threat in that case. That's the nature of robbery, and that's — I think that's actually, you know, basic to this Court's Hobbs Act jurisprudence, is that, you know, that's why it's been held to qualify for the force clause, is because there's always a threat of injury if the victim doesn't comply, and part of noncompliance is staying put at least long enough to transact. But where do the other circuits stand on this? It seems to me that the circuits are going both ways on this issue. Is that correct? It's a mess. I mean, it is a mess. The Second Circuit is clearly — does support the notion that it must be — that the commentary has meaning, that the — that merely ordering somebody to the ground is insufficient. They, like Hickman, note the significance of the guidelines' effort to single out a particularly depraved kind of robbery in which people are locked up. On the other end of the spectrum, you have the Fourth and Tenth Circuits, which I think are close to saying that all robberies involve restraint. They don't say that in terms, but merely brandishing a weapon, conduct that's clearly insufficient under Hickman, has been held to qualify under — in Miera and Dimash in the Tenth and Fourth Circuits. Was there anything in this case that puts it out of the realm of a regular burglary? Well, there's facts that are not going to be present and that tend to aggravate a robbery, but, you know, the standard isn't additional facts that make the robbery bad. It's additional facts that aggravate the robbery because of the use of physical restraint. So while the government does a credible job of finding additional factual distinctions from Hickman, the standard isn't facts in addition to Hickman. It's facts in addition to Hickman that are physical, that make the restraint physical. And so if we're just looking for additional facts that tend to aggravate the robbery in an effort to try to — if that's the standard, then that's not a standard. That's going to be — you're going to get completely different results in different district courts based on identical conduct. The standard I propose, by contrast, is exceedingly easy to apply. I mean, that will account for almost every case clearly on the face of the record. If the victim could move in that case, then the restraint enhancement won't apply. If the victim was physically restrained, their body was limited in its scope of movement irrespective of what they decided to do, then it will apply. So if we respect that — what the Commission is trying to do in trying to create uniform sentencing and avoid disparity between sentences and isolate the worst kind of robbery in all its many facets, then this particular facet shouldn't apply unless you have binding, untying, locking up, holding, something of that nature. What if one or more victims had been herded into a large vault in the bank? That's a — that is the one tricky issue, I think. If the — under the very strict standard that I would propose, it might depend on whether the vault is locked. But I do want to say that there is a — Let's say it's a very large, well-lighted, air-conditioned vault with chairs and tables inside, but it is locked. Oh, if it's locked, if it's — if it is locked from the outside, unquestionably under my standard, that would count. And that's usually why people herd somebody into another area is because they want to contain them, not just to put them on the other side of the room. So clearly that would count, that if the — if they're herded somewhere. But in that case, you have a lock. You have something that physically contains them as opposed to something that contains them by threat or what is communicated. Now, I would say — now, there are some out-of-circuit cases, and this, I suppose, would be probably the government's chief objection to my argument, that my — my standard doesn't account for some out-of-circuit cases in which people are herded but not locked up, and that's been held to count. But there is, I think, a credible textual argument for a sui generis exception for this conduct of herding, which is that you get a four-level abduction enhancement for forcing somebody to accompany you to another part of the room. So if the court for some reason thought that the movement wasn't far enough or something like that to merit abduction, it might seem strange or anomalous that they wouldn't get at least two for moving them part of the way. And so when you take that and then you take the commentary, which says there's an enhancement for when the defendant forces somebody to accompany them or physically restrains them, you might be able to put together an argument that the herding behavior merits the abduction even in those other cases. You don't have to reach that in order to decide this case. Thank you. Thank you. You've saved time for a vote, Mr. Page. Mr. Funnell. Good morning. May it please the Court. My name is Tim Funnell. I'm here representing the government in this case. The district court's ruling should be affirmed because it adhered to the language of the physical restraint guideline as interpreted by this court in Hickman. Hickman and other cases have discussed the need for limiting principles. The term something more or sustained focus, those two terms have been used by other circuits. And those facts are present here. We agree with Garcia to the extent that when you have, in his reply brief at page nine, he says that when you have a robbery that involves the quote unquote touching the body of the victim or quote unquote other intentional direct and substantial control of the body of the victim, that the restraint guideline is applicable under either of those scenarios. That's obviously a fact-dependent decision by the district court. But in this case, under these facts, we have both of those scenarios. And we have facts that are well within the confines of this court's discussion of the restraint enhancement in Hickman. There's a total of three employees involved in this incident and three robbers. However, they don't all come in contact at the same time. Initially, it's two robbers entering the store, both armed with pistols. And I think it's important to point out that it's a gun store. And when you have a robber who is specifically targeting a gun store, one of the things that might motivate them to restrain employees in order to facilitate the offense is ready access to weapons defensively by the employees. So here, we have evidence that that's exactly the approach that these two robbers took. Because the only employee that they saw when they first went in, and I'll refer to him by first name just for ease, is Mike. Mike, according to the record, indicates that he is, at the time, on the phone with his back to the robbers. So this is a very dynamic entry. Dynamic entries aren't necessarily atypical of robberies. I would submit that most robberies are dynamic. However, what separates this one and makes the guideline applicable is what happened next. One of the robbers put a sustained focus on restraining Mike by sneaking up behind Mike and physically putting his weapon into the back of Mike's neck. That, according to counsel, is one of the determining factors that would make this restraint enhancement applicable. Not only does Mike say he shoved the gun into the back of my neck, but he ordered me to the ground three or four times. He also spun me around and ordered me to get to the ground. Now, in the record, it indicates that Mike was physically unable to comply with getting all the way to the ground. However, the record also indicates that another employee who came onto or came into the scene at that point because he heard the glass breaking, he said when he came out, he could see the robber who had focused on Mike standing there with his gun at Mike's head standing over Mike. So we do have the intentional manipulation, the forcible control coupled with not only an implicit threat, but overt threats, physical touching of the barrel of the gun into the back of the neck. So we have that going on, and when one of the robbers did what he intended to do to facilitate the offense, to borrow the language from the guideline, the other one is busy trying to get the fruits of the offense. He's smashing gun cases and retrieving nine pistols that they were able to get away with. That these robbers were intent on restraining employees to facilitate the offense is not only shown by what they did to Mike, the employee who was visible when they first entered, but Ricky, the employee that came out in response to the crashing of the glass, they couldn't sneak up on Ricky to restrain him. Instead, what they immediately did without hesitation is started firing. So they start shooting at Ricky. Ricky has to dive behind the counter. He gets shot in the ankle in the process. He loads his weapon, and he's able to return fire. So we have at least two robbers who are firing. We have an employee that is firing. They are able to make off with the nine weapons. And. Was Ricky brandishing a weapon when he came out? The record indicates that he was. However, it would indicate that it wasn't loaded because he gave a statement to the court indicating that as soon as he dove behind the counter, he loaded his weapon and was then able to return fire. So again, here we do have the facts within Hickman, within the other circuit decisions. And I would submit that even under the standards proposed by counsel here, which I do think go too far, it's nice to have bright lines. We all want bright lines and easy tasks. Well, Hickman talks about what constitutes a normal robbery, doesn't it? Yes. It talks about the need to have something other than, say, the mine run robbery. You have to have additional facts because it agreed with that merely brandishing a weapon is not going to be enough. They cited the Seventh Circuit's decision in Dalbet, and they said that a threat to move is implicit. So here, your contention is that the pressing the barrel of the gun against the back of the net takes it out of the run-of-the-mill pedestrian kind of armed robbery. That's correct, Your Honor. And that's just not my position, but that's the position of the defense, as I understand it. Because again, they've talked about physical touching coupled with overt threats, physical, intentional, forcible control of the victim. And when you take a look at the statements that were made incorporated into the PSR, because each of the three employees submitted statements to the court that discussed the facts of- If he just pointed the gun at him and never touched the barrel of the gun against his neck, you'd make the same argument? No, I wouldn't necessarily, because this court in Hickman said that merely brandishing a weapon without more is not necessarily enough. So I could not, by taking out that fact, I could not- So that fact alone changes everything in your view? It's a fact-dependent determination, and that fact is, I think, critical- Alone? Does that fact alone change everything? The fact that he touched the weapon? Exactly. It can, under the right set of facts, but I can't say that that fact alone would be enough by itself. I can, under these facts, in their totality, say that what he did in approaching Mike from behind, putting the weapon against the back of his neck, coupled with what came next, which is, according to Mike, turning him around, ordering him three to four times to get down, and then standing over him with his gun on Mike as Ricky comes in and describes it, that is physical restraint. That is what this court said in Hickman, is that we do not need to have what counsel is proposing, which is the inability to move unless you're inclined to do so as the victim. So, and the government was aware of all these facts when it decided to argue that the enhancement wasn't appropriate under these facts? That's right, that's right. And then the government changed its position? We have changed our position. We objected before the district court. What we indicated at the time in our written objection- You objected to the application of the enhancement? Yes, we did. In our written objection, we indicated that, we talked about Hickman. We believe that under the facts that the guideline is likely precluded, are the words that we used. And we didn't say that it was crystal clear, we didn't say that it was foreclosed, but we did object. Absolutely, it's part of the record. Once we got to the sentencing hearing, and I should say, just to back up, the defense in their written objection didn't offer anything in writing or any other analysis, factually or legally, beyond ours. They simply joined ours. But you initiated it? Yes, we did, Your Honor. And then fast forward to the sentencing, when the district court asked if the parties had additional argument or evidence, neither party did. They stood on the written objections. And then the district court, having the benefit of both parties objecting, nonetheless decided that based on its analysis and the PSR addendum's discussion of Hickman, the facts of the case, the PSR addendum also surveyed other case law, it rejected our position and it rejected the defense's position. So now the posture on appeal is that we're able to, on an appellate timetable, take a look at, have the benefit of a district court decision where they rejected what we had argued previously. And we're not motivated here to defend the district court's decision by the standard of review, because that's de novo. Instead, we're taking a re-examination of the facts, looking at Hickman, looking at the case law, and deciding that we simply, before the district court, took too narrow of a view of Hickman and took too narrow of a view of the facts in this case that make this restraint enhancement applicable without having to go beyond Hickman, without having to ask this court to carve out any other rules. Instead, this court in Hickman gave itself ample room to decide that the restraint enhancement in this case, that there is something more, that there is a sustained focus, that there is a physical manipulation of the victim that's in this case. I think one of the defendants was at the door with a gun. Does that factor into anything, or is that a normal robbery that someone stands at the door with a gun? Is that a factor that should be considered, or it has nothing to do with it? Are we just concerned with the gun that was put up to the person's neck? Is that what made this guideline apply, not the person at the door with the gun, but more the person that put the gun to the person's neck? It's both, Your Honor. The PSR addendum pointed that out and highlighted it. The district court adopted that rationale, and we are certainly arguing that. We have agreed and adopted that as our position in our briefing before this court because that is something that separates this, that we also have, under the totality of the facts here, which the district court considered, we have one of the robbers, I mentioned that there were three, two made entry, one of them makes his way to standing near the doorway. And he is standing near the doorway for a certain period of time, and then according to his own statement, he also comes and joins in the robbery and actually assists in loading some of the guns in the cases. During this entire time, of course, we continue to have Mike physically restrained by the first robber. We have the other two who are now emptying the gun cases of, or gun cabinets of pistols, and we have the exchange of gunfire going on as Ricky comes out. So all of those facts clearly put this within the confines of Hickman. And again, that is something that we simply took too narrow of an approach of considering. Fortunately, the district court did not. But aren't there already things in place, the guidelines, for example, or some additional charges which would account for a gun being fired in the course of an armed robbery? Well, we had an additional count here, Your Honor. We had the 924C count, which does address some of those very concerns, absolutely. The guideline here that we're talking about is strictly on the Hobbs Act robbery and whether it was going to be an additional two levels, whether the range was going to go from 41 to 51 to 51 to, I believe it was 70, 71. So to answer your question, there are other considerations at play here under that second count that the court could consider. So you rely primarily on the gun being placed at the back of the head, touching the head. Isn't that it? Isn't that the fact on which you rely primarily for your contention that this was some physical restraint? I'm going to, I don't want to use the term primarily because, again, it is so fact-dependent that the district court here didn't focus on any particular fact. Instead, he looked at everything in totality as he should and as the guideline encourages him to do. And the guideline also talks about the offender's intent, the intent to facilitate the offense and to facilitate escape. And so when we're talking about putting the gun against the back of Mike's head, that certainly helps give us good evidence of what the intent was to restrain in order to facilitate the offense, and that goes back to what I began my recitation with, you know, the fact that the only employee they see is Mike. He's an employee of a gun store, somebody who could have access to weapons. So that is one incredibly important factor is what I'll say, of course. But it's more than that because you start to get into what Hickman says where merely brandishing a weapon without more is not going to be enough. Fortunately here, this court wouldn't have to make that distinction because you do have more, you do have sustained focus. And as counsel has urged, you have the physical manipulation of Mike standing over him with a gun right on him and another employee coming on the scene and seeing this and reacting the way that they did. And physical restraint not only to facilitate the offense and to facilitate escape is clearly part of the reason for the enhancement, but also physical restraint, it creates a certain environment. It gives a level. When you say standing over him, do you mean that Mike was on the floor? No, I'm not saying that he was on the floor because the record doesn't support that. It indicates that he was physically unable to comply. But it. That's, I mean, and that was my recollection of the facts, that he was physically unable to comply. That's why I'm trying to understand what you mean when you say standing over him. Well, what I would point to is the statement that Ricky submitted to the court indicating that when he came into the main area, he, and this is at 155 of the record, that Ricky sees one of the robbers, quote unquote, standing above Mike. And he also said that this robber had his gun to Mike's head as he's standing above Mike. And then we also have Mike's statement where that is at page 139 of the PSR. We have Mike's statements to the court at 156 and 157 of the record where he indicates, I'm on the phone with a customer, my back is to them, and all of a sudden I get a weapon shoved up against the back of my neck. And three or four times I'm turned around, ordered to comply, or ordered to get to the ground. So that's what the record supports. So we do have, as counsel indicated and as the court was asking, we have circuits that are not uniform, to put it mildly, on how and when this restraint enhancement should be applied. We would argue that this court in Hickman has carved out a very solid middle ground. And that's something that the Dimash court talked about. Some, they said that certain circuits have read the guideline broadly. Certain circuits have read it narrowly. Dimash was decided in 2011, much later than this court's decision in Hickman. Interestingly though, Hickman wasn't part of its survey of cases. So I don't know what the circuit court in Dimash surmised about the Hickman case. Maybe it hadn't been brought to their attention. Or maybe they decided that it wasn't necessarily in the broad camp or in the narrow camp. Instead they took Hickman for more of a moderate approach. I would argue that whether Hickman is characterized in the broad or the moderate camp, the facts here qualify. And we would urge the court that under the facts of this case, where you have two masked robbers, both of them armed with pistols, enter a gun store, approach a store employee under these facts, order him to the ground, stand over him with a gun while another robber is able to facilitate or, excuse me, to complete the offense, that under the precedent of this court, these facts fit the restraint enhancement. And we would ask you to affirm the district court. Thank you. Thank you, Mr. Fung. Mr. Page, you saved time for rebuttal. So what effect should we give to the fact that one of the robbers was standing at the door? In other words, why wouldn't that be the equivalent of being locked up, to use the words of the commentator? Because it contains the victims by deterrence rather than by their physical inability to pass him, assuming the defendant doesn't, and I think this was my client standing at the doorway, doesn't occupy all of the two-dimensional space in the doorway. It's possible to pass him. It's just that the victim is disinclined to do so because he's there and his presence is a threat. So not only does it not represent physical restraint, but it's not much above what happens in an ordinary robbery. Robbers enter through the door. I mean, you know, you might have a different case where people are herded and the defendant blocks the narrow entrance to a part of the scene. But in the case where the defendant is merely there, all you have is just another threat to people not to move. It doesn't add anything. Does the element of a robbery, Hobbs Act robbery, does the element of the offense have any restraint involved in describing the element, what is involved in a robbery? It's a threat of injury in order to obtain the money. It is not technically necessary in every single case that there be a feeling of restraint. A robber could say, get out of here, I'm going to take the money. But as Hickman points out, in the overwhelming majority of them, there is a threat not to move. And the threat is implicit, that if you come to the employee or the teller and say, I want the money, that person understands that it's not enough to at least transact the robbery. If the court wants to know whether the government standard will produce different results from identical facts, it need only look at this case. It's not merely that different district courts will reach the different results, opposite results based on different facts. The government itself, applying its own standard in this case, reached different results based on the exact same case. Below, they looked at the same set of facts and said, this is not physical restraint. Now they're looking at the same set of facts, saying this is physical restraint. If you don't want that to happen, you need a narrower standard in this case, which is a standard that makes a difference, a differentiation, if a gun is actually pressed into the back or some other part of the body or the neck of a victim, that wouldn't be a helpful bright-line rule? Well, no, it wouldn't. And the reason that we know that is that there's contact in Hickman. In Hickman, the person is tapped with the gun. So the government is basically proposing a standard which is — which makes the subtle distinction between tapping with a gun and pressing it into the head. That's — that kind of subtle distinction is never going to produce consistent results in district courts. If you have two different situations, one where they put a gun to your neck and say, give me all your money, and the other one says, don't move, is there a difference there? One says, don't move, and the other one just says, give me all your money. In both situations, they put the gun up to your neck. Would you have — would the guidelines apply and you'd add two points to the case where there was an order not to move? You would add — you would add no — you wouldn't add points in either one of them, I submit, because in both of those cases, you would have an order not to move, implicit or explicit, that's based on a threat rather than the physical, direct immobilization of the body in that situation. I'm — I'm suggesting to you that it ought not apply unless the defendant is — I mean, the victim is literally incapable of moving. In both of those cases, the victim could turn around and run away if they were foolhardy enough to do so or inclined to do so. And remember, this guideline punishes threats, including threats not to move. All of the facts named by the government in this case, other than standing in the doorway, produced additional punishment. The fact that there was gunfire produced additional punishment in this case because it gave the defendant a 924c. The injury produced additional punishment in this case. It's just that — that it doesn't produce the additional little two-point enhancement for the particularly depraved behavior of physically immobilizing the victim. Thank you. All right. Thank you, Mr. Page. Your case is under submission.